Alright, please call the next case. SVV-LS, LLC v. The Estate of Nancy Bergman Alright. And Mr. Beagle. Mr. Beagle, welcome. And I thought maybe that large crowd was here to hear you and Mr. Magnus. I can't believe they left. But, you know, tough act to follow, I guess. I guess so. Alright. You may proceed when you're ready. Yes, I'm ready. Thank you. May it please the Court. The briefs in this matter are fairly lengthy, but the way that I view the issues, it really comes down to two points. And two points only, because we're dealing with a matter of statutory interpretation, specifically of the New York Insurance Law 3205b-2. Under that statute, as it existed at the time, which has been since modified, but that's not relevant here, anybody can take out a life insurance policy on their life and make the beneficiary anyone they want. What the previous law prohibited was that if you, the insured, are not the one who takes out the policy, or to use the word of the statute, procure or initiate, and a stranger, that is somebody who does not have any particular connection to the insured, if that stranger takes out a policy and the beneficiary is not, or have an insurable interest, then that's prohibited. And in that case, the proceeds of the policy, assuming that the insurance company did not contest the validity of the policy within the requisite period, would go to the estate. That's what this case is really all about. Counsel, I want to, before we get to the legal question, I'm just wondering, as I recall this case, the appeal is from the motion for reconsideration. Is that, am I right about that? Well, I don't think it's, that's true, because that was the last motion that was filed, and that's what led to the discovery. But really what happened here is that a summary judgment was issued before there was any discovery. And then the court, on a motion for reconsideration, said, okay, we'll let you take some discovery. And the discovery was taken, and then although the court said, in one sense, the motion for reconsideration is denied, in a real sense, the motion for reconsideration was granted, but then the summary judgment was granted. So the substance of this appeal has to do with the summary judgment. Well, let me ask you this. Let me just tell you how I'm kind of viewing the case, and I want you to be able to respond and tell me why this might not be the right way to view the case. So you have the summary judgment, summary judgment's granted. Then you have a motion for reconsideration. They allow discovery, ultimately say, no, our original decision is right, the district judge. The district judge then goes in and gives a couple of reasons. One is the legal reason that was given on summary judgment, but also there's the reason that, you know what, the parties are just trying to rehash everything or almost everything that they said at the summary judgment phase. The discovery really didn't do anything for us, and so, therefore, I'm going to deny it on both of these grounds. And if that's true, then we could affirm on the ground that this was just a rehash of what happened at summary judgment and not even have to reach the legal question because we have cases in this circuit that say, if all you're trying to do is rehash what happened on the merits, then we don't have to, we don't have to, you don't have to re-entertain those arguments. It's not a rehash, and let me explain why. Okay. The judge's view of this case was entirely based upon the Kramer decision, entirely based upon what we believe was a misapprehension of Kramer and the law. The court looked at the basic facts of the case and said, Nancy Bergman knew what she was doing, she's the one who initiated and procured the policy, and, therefore, SPV is the purchaser's entitled to the proceeds, period. What the judge never considered, never considered at all, was the fact that Kramer has nothing to do with this case because in Kramer, there's no dispute that the attorney, the insured, obtained the policy, and the issue there was assignment. There was no dispute about that. What the lower court judge in our case failed to consider from beginning through the end was that unlike Kramer, there was a substantial question whether Nancy Bergman, as you should interpret the statute, actually procured or initiated the obtaining of the policy. So the discovery, of course, meant nothing because the judge never changed his view that Kramer and this case were on all fours. So whether you look at this as a motion for reconsideration that's on appeal, or the granting of the motion for summary judgment, whether you look at your obligation on a summary judgment appeal to review at de novo, or you look for motion reconsideration whether it's manifest injustice, I submit, Judge, that where there's a clear error of law, where a court clearly misapplied a precedential case, that reversal is required under any standard on appeal. And I don't think it's necessary to get hung up on the procedural niceties, not that I'm demeaning procedural niceties in an appropriate case, but here you have really purely a question of law. And if the court misapplied Kramer and Kramer does not have precedential value under the undisputed facts of this case, it has to go back because then there become issues to be tried. Whether or not, for example, the insured Nancy Bergman, whether the fact that she consented, she was part of the scheme, let's assume all of that's true. If all of that's true and Kramer applies and B-2 doesn't apply, then no policy for all practical purposes under B-2 would ever be out the window. Why? Because no matter who applies for insurance on one of your lives, for example, you're going to have to do something. You're going to have to submit your medical records, your medical history. You're going to have to demonstrate that your consent. So in this case, Nancy Bergman never owned the policy. She never applied for the policy. Is this the argument that you made in response to the motion for summary judgment initially? The response to the motion for summary judgment from my review of the record, because I was not trial counsel, was opposed essentially on issues of insurable interest. There was a reference to who procured the policy, and the lower court did talk about that in its granting of the summary judgment. But there was more focus on Part 2 of the analysis, which is whether or not Nachman Bergman had an insurable interest, than there was on Part 1 of the analysis. Because on Part 1, the judge simply said, this is just like Kramer. But the problem with the lower court decision, it's nothing like Kramer. Well, I guess then my question is, when the district court said, this is just like Kramer, did you present the reason why it wasn't like Kramer to the district court before it ruled on the summary judgment? Not in the way that I would have presented it, or the way I'm presenting it now. Does that cause a problem in sort of the procedural complexities that Judge Strauss has talked about? Does that cause any problems for how we view the motion for reconsideration? Well, it's not a jurisdictional issue, but the court certainly can say, you didn't raise this adequately below, and therefore we're going to affirm, you're raising this essentially for the first time in appeal. That's happened in many cases. But it's discretion on the part of the court. And the fact is, when you have a clear question of law, and the trial court made a specific decision, it's not as if the trial court wasn't aware of the issue, because it cited Kramer, and it relied heavily on Kramer. So while I certainly agree that the trial counsel in this case could have emphasized that point more, I don't think it would have had any effect on the court, because the court below was convinced that Kramer applied. And I can understand why the court felt that way. It's just my own review of the statute leads me to believe, and be really convinced, that unless you look at it from the standpoint of when a stranger obtains a policy on the life of another, you are always going to have the life of the other involved in the process, because that's what's being insured. And if you call that procurement, then under the New York statute, B-2 could never apply. That's what's wrong with applying Kramer. In Kramer, there was no issue, because the attorney, Mr. Kramer, he clearly obtained the policy. He clearly had the ability to fund the policy and pay the premiums. Here you have a situation where the trust obtained the policy. The trust was the owner from day one. The assignment, like in Kramer, was not an issue, because Nancy Bergman could never have gotten this policy on her own. Forget her age. The age is irrelevant. She would not be able to demonstrate the ability to pay the substantial premiums. If you recall from the record, Your Honors, there were five insurance policies here. Forget about the fact, well, don't forget about it, but there was a $10 million policy here, but there were four other policies. And there was a broker involved, and it's not relevant here to get into the somewhat peculiar, if not shady, characteristics of this whole transaction, but the bottom line is this was not a Nancy Bergman getting insurance on her life. This was not Nancy Bergman initiating anything. Nachman Bergman met this broker in Israel and then decided to be part of the scheme for some money, and he went to his grandmother, who he had very little relationship with. He's not even named in her will, and said, how would you like to make a few bucks? I can make a few bucks, and all you've got to do is fill out some health forms and we'll take care of the rest. She didn't even know any of the details. She didn't know who the trust was. She didn't know who the owners of the trust were. She didn't know who was funding the trust. Are these the facts that were developed after the motion for consideration was heard by the district court and he allowed additional discovery? It was during the additional discovery and throughout the case, but the judge's opinion just concluded that because she knew that the policy was being taken out the way it was, because she consented, because she signed forms that were required for her to sign, that means she initiated or procured the policy. And that's why I'm saying if that's the case, and one talks about precedent, then this statute, which has since been amended, but this statute to the extent it applies to other situations, you would never have a situation that was violating the statute. You wouldn't even need to go through the assignment. The interesting thing about the whole assignment idea was that it required, at least it required, the insured to take out the policy and have the ability to qualify for the policy and pay the premiums. At least that was true. So the court said, well, that's really not a wager. That's a legitimate investment because the insured is actually the one initiating and procuring the policy. He's financially able to pay the premiums. That's not this situation. This is not- Under New York law and under Cramer, isn't it a question of insurable interest? The insurable- Not the person whose life is insured, but whether there is an insurable interest on the part of the party that purchases the insurance. Isn't that the question and the question that the district court, if a question related to that was presented, wasn't that the question that the district court dealt with? Not an argument about whether Nancy Bergman, whether there was some problem with Nancy Bergman's involvement here. There are two points here with reference to what you're mentioning, Judge. The district court first applies Cramer. When it applies Cramer, then Nancy Bergman is entitled to take out the policy and make a non-insurable interest beneficiary. Under B-1, if you take out a policy on your own life, you can make anyone in the world a beneficiary. They don't have to have an insurable interest. The insurable interest issue only comes into play when a stranger obtains a policy on another's life. The court focused then not so much on the insurable interest of the trial court, not so much on the insurable interest of Nachman Bergman, but whether or not she was coerced, whether or not she was defrauded, whether she was of sound mind. The court found that she wasn't coerced, she wasn't defrauded, and she was of sound mind. I don't object to any of those findings because that's not the issue. So the insurable interest issue, while it was mentioned by the trial court, was not the focus of the court's decision in the sense that I'm saying insurable interest is the focus. Once you have someone other than Nancy Bergman procuring the policy, then there's a fact question whether Nachman Bergman, as the initial beneficiary of the trust, had an insurable interest. And what happened in the trial court, and to some extent in the briefs below, was a conflating of these issues. So what got lost in the shuffle was the key question, is this case really like Kramer? So your theory on the insurable interest is that Nachman Bergman, even though he didn't directly own it, and I don't think the record shows that he paid premiums either, but it was because he was the beneficiary of the trust? Is that why he's the one that's attributed the insurable interest versus Nancy Bergman? That's right. Nancy Bergman was just going to get, and it's not clear that she got anything, but she thought she was going to get $50,000, but she was not a beneficiary. The beneficiary of the trust was Nachman Bergman, and the trial court did talk about whether the fact that he was a grandson and so sort of presumed that he had an insurable interest. But the point is that if you analyze the New York statute correctly, in my judgment, and you look at B-1, B-1 doesn't require Nachman Bergman to have an insurable interest. If she had bought the policy, if she procured the policy and she paid the premiums, she could leave it to me, she could leave it to you. That's perfectly legal under B-1. What isn't appropriate under B-2 is if I acquire the policy on the life of Nancy Bergman, I have to be able to show that I have an insurable interest if I'm the beneficiary. Counsel, I want to ask you before your time expires, I want to ask you about the sanctions. Yes, please. Which is the district court seemed to just misapprehend what was going on here. I think that the argument of opposing counsel was that, was essentially from, was it SVC, I don't even remember the party name, SPV. Yes. The argument was essentially that, look, we relied on the metadata. We don't even have a document examiner to look at this. There's no mention of a document examiner. And so the district court just got a fact wrong. Why shouldn't we send that back down and allow the district court to reconsider that if they just, if the district court just plumb got that fact wrong? Well, because SPV doesn't have any facts to establish that there was any wrongdoing in that regard. You can't have a, Mr. Foss, I believe, was the attorney. He's not an expert. He's saying, oh, I figured out from the metadata what happened here. Well, that's not evidence. He would have to have an expert. They got off track. I'm agreeing with you that there may have been some misapprehension between an expert and a document examiner. It may have been used loosely by the court and the parties or interchangeably. But at the heart of this, is there any evidence that Mr. Kroll did anything wrong or unlawful? And the court said no, regardless of, the court didn't say, oh, Mr. Foss, you don't have an expert. The court simply said there's no evidence that's sufficiently convincing to conclude that Mr. Kroll did anything wrong. But you agree that there's no document examiner now? No. Because you even mentioned in the brief something on one of the footnotes about there not being a document examiner. I just want to be certain. There is no document examiner. Okay, thank you. And I only have two and a half minutes left, so I'll reserve my time. Thank you. Thank you very much. Mr. Magnuson? He doesn't want to go up. Okay. May it please the court, for the record, Eric Magnuson on behalf of SPV. The only issue that they raised in opposition to the motion for summary judgment was that New Jersey law applied and New York law didn't. They ignored Cramer, they didn't address it substantively when we raised it, and they lost. Cramer could not be more on point, and I'll talk about that in a minute. But what they said after they lost was, well, wait, there's an element of fact here that we didn't get to discuss. And the judge said, seems to me like he had plenty of opportunity to discuss that. But since discovery is ongoing with respect to the trust, I'm going to hold your motion in abeyance, and I'm going to let you participate in the discovery. And they went through discovery, and they produced nothing to support their claim that there was a nefarious influence. The record is overwhelming that Nancy Bergman was a sharp woman who understood she was buying insurance. She asked her grandson, who brought the plan to her, what's in it for me? And she got money, $50,000, according to her grandson. Now, counsel made a couple of statements here in argument that I need to respond to. He said, Nancy never applied for the policy. That's flat wrong. There are documents in the record. She signed the application. She went to health insurance examinations for the insurer. She was interviewed by my client as part of the transfer of the policy. She knew what she was doing. And as Judge Pearsall said, she may not have been sophisticated, but she knew what was going on. Are they trying to, is opposing counsel trying to make some distinction on the idea of his own initiative, procure or effect a contract? Is that different than simply signing the contract? What he has said in the brief and now said in oral argument is, this is different than Cramer because in Cramer, Mr. Cramer, Arthur Cramer, was the one who came up with the idea. Again, flat wrong. At page 537 of 940 NE 2nd, the court says that the investor approached Arthur with the idea. The investor, as here, funded the policy. Again, counsel's representation as to what Cramer says is wrong, and you can check it. Then the court says, if I might just finish, at page 541 of 940 NE 2nd, the notion of obtaining insurance and the details of the insurance contract need not spring exclusively from the mind of the insured. Rather, the insured's decision must be free from nefarious influence or coercion. Contrary to the dissent's view, the initiative requirement, without more, does not prohibit an insured from obtaining a policy pursuant to a non-coercive arrangement with an investor. They don't have any facts for their nefarious influence. So on appeal, they've walked back from that one. Their first argument was New York law doesn't apply. They lost. They've now abandoned that. On reconsideration, they said, we're going to give you evidence of nefarious influence. They have one page in their brief with no record sites where they talk about it. Now they have new arguments. The new arguments are unclean hands, that she didn't really love Nachman. Again, those weren't raised. Judge Strauss, to your point, it would be perfectly within your power and the record in this case for you to say, look, the only issue you've brought up is the denial of the reconsideration motion. And on that, there's no manifest injustice. There was no abuse of discretion. And we're going to affirm on that ground alone. Yeah, I want to follow up on that. I think I misspoke earlier when I said rehash. I actually meant new arguments. I thank Judge Kelly for highlighting. Yeah, new hash. There you go. But the point is, I think, they would say, well, all we did was go on the choice of law issue. That's why we filed summary judgment. And alas, the district court went and decided everything. And so we're coming back now and we're saying, geez, we were surprised by this. And you see some of this in their brief. And now we've got to do what we really wanted to do on summary judgment. Now we've got to do it on a motion for reconsideration. What's your response to that? You don't get a do-over because you made the wrong argument. We were very clear in our motion papers, and we brought the summary judgment motion. New York law applies. Here are the elements of Cramer. And Cramer couldn't be more on point. If you read the certified question in Cramer, it is exactly the question that's presented here. And the answer is equally clear. What they can't do is, as they have done throughout this case, come up with new arguments after they lose. This case has an unbelievable history of litigation in the Eastern District of New York, Southern District, the Central District of California, where my client has had to chase down the truth and has had to wade through all sorts of obstacles to get there. And that brings me to the sanction issue. Judge Ross, you got it exactly right. They say in their brief, well, the judge thought there was going to be a document examiner report and there wasn't one, and so they lose. Absolutely wrong. Judge Pearsall worked hard on this case. He put up with a lot of stuff. But he simply got it wrong when he talked about document examiner. And it's not that Mr. Foss is an expert. What happened is that Attorney Kroll, who represented the estate, was actually hired by Jacob Herbst, who is one of the investors in the trust. There's an e-mail, we've got it cited in the brief, where Kroll sends an e-mail to Sim Bergman, the PR of the estate, and he says, Herb Kroll contacted me and said you need a lawyer. I'm going to represent you. Here's a retainer agreement. Well, that should set off a red flag, because their whole argument really is that the nefarious influence, these bad trust investors are the ones who caused the problem here. They're the ones that are funding the estate's litigation. And what's absolutely astounding, Your Honor, is if you go to page 8 of our brief, and I've got scribbles on mine, but we've got the retainer agreement. The retainer agreement that was produced in two different forms. As it was originally produced by Mr. Kroll, it listed the client. E-discovery means the total amounts received in connection with the action by the client. The client was defined as the estate. Kroll said that's the one, that covers it. The magistrate judge in the Central District of California, when we subpoenaed Kroll's files, made him sit in her courtroom for a deposition and then said I'm going to make you get an e-discovery vendor, and that e-discovery vendor is going to produce the metadata off your computer, and we're going to see what's going on. At that time, Kroll produces this revised retainer agreement. It's got a different set of clients in it. It's got the estate recovery going to Kroll's feet, which is what we've been claiming all along, that the nefarious, the bad guys that they say are running this lawsuit are actually, I'm sorry, the bad guys that were behind this scheme are actually running the lawsuit. And that's not Mr. Foss's opinion. That's from a spreadsheet of metadata that we've, it's in the appendix, and it has signed retainer agreement, date created July 20, 2016. It's produced July 22, 2016, and the one that's produced is the altered one. That's the evidence in this case. But that's for the district court then to determine on remand, right? It is. We can't determine it. We have to say you got a fact wrong and you need to take another look without that fact that you. Exactly. Okay. Exactly. And we're confident that we'll make that showing. But, you know, I understand the deferential standard of review on sanctions, and it's not an argument that I would bring, but for the fact that Judge Pearsall said in context, he said, yes, there were a lot of discovery issues, and yes, there were lots of orders to compel, and yes, there was a lot of litigation, but on balance I'm going to find that the lawyers didn't intentionally do anything wrong. He said it would be a different thing, however, if there was actually a forged document. But I'm not going to have a trial over whether that is because they're disputed document examiners, et cetera. He was just wrong. He just missed that fact. And I think with respect to the sanctions, you need to reverse, you need to send it back and say, look at that again, Judge Pearsall, because these are serious allegations. You know, I mean, this is beyond kind of the normal, well, they didn't completely give us all the discovery. They produced 48 documents and said, these are a full set of the documents responsive to your discovery. And when we got a hold of the computer compelled by the magistrate judge in California, there were 2,000 documents that should have been produced and another 1,700 listed on the privilege law. If there are going to be any sanctions under Rule 26 for incomplete discovery responses, that ought to justify it. And if that's on balance in the judge's discretion, he's still not quite there. If he goes back and he realizes that there actually was a forged document, that balance will be tipped. Forgive my lack of expertise in metadata and analyzing it, but help me understand exactly what the judge had in front of him. When you say metadata, I understand that in the metadata you can get additional information that you wouldn't otherwise get. But what did the court actually have in front of it? The court had in front of him an affidavit from Doug Foss, and you're looking at the spreadsheet there, that had attached to it the spreadsheet from the e-discovery vendor that Kroll himself hired. And the spreadsheet lists, first of all, he had Exhibit 29, which is at Appelie's Appendix 1477, and that's the e-mail from Kroll to Sim Bergman saying, here's the retainer agreement, sign it and send it back. Then he had the Exhibit to Kroll's February 7, 2017, Declaration Document 469, which is in, I believe, Appelie's Appendix 871-76, which is what we call the redacted agreement. Then he had in front of him, as Exhibit 30 to the Foss affidavit, what we call the full agreement, which has the language that was excised. And then he had the spreadsheet, which was Exhibit 4 to the Foss affidavit, which showed document number 8, retainer fully executed to client. And it carries on to the next line, date created 7-20-2016, although it's dated August 26, 2015. So based on the documents that you presented plus this metadata, you're saying that that's enough to show the district court that that was false? Yes, and the district court didn't really look at that. What the district court said was, I didn't get a report from a document examiner. And you're saying you don't need a document examiner to read this type of metadata because of the other documents you had to? Right. At a bare minimum, the judge was looking at the wrong thing, and you should send it back and say, look at that again. This should be sufficient. If the judge has a question, we can deal with it. But what's absolutely clear is he was wrong on why he did what he did. And when you base a decision on sanctions based on an erroneous fact finding, a clearly erroneous fact, then that's an abuse of discretion, and you should remand it for reconsideration. I didn't talk much about Kramer, but I just want to leave you with this. New York allows what are called life settlement transactions. Life settlement companies like my client are licensed by the state of New York, and so in New York there's a thriving industry where someone has a life insurance policy and they want cash so they sell it. Up until shortly after this transaction, it didn't matter if the life insurance policy was procured in the first instance with clear intent to immediately transfer it to someone else. That's what the Kramer case was about. And Kramer said, look, there are lots of other jurisdictions that say, as a matter of public policy, we're going to call these wagering contracts, we're not going to allow them. And what the New York Court of Appeals, the highest court in New York, said is, this is okay according to our legislature and we're going to allow it to stand. The plan doesn't have to originate with the insured. It can originate with an investor. That's a specific statement coming out of the Kramer case. The trust, the original beneficiary in Kramer was for his children. The original beneficiary here was for Nachman Bergman, Nancy Bergman's grandson. The contestability period elapsed before my client got involved. That's key because under the Caruso case in New York, once the two-year contestability period lapses, no one can go back and challenge the fact that, well, there was fraud in the procurement of this policy or that it was a wagering policy. That's different. In New Jersey and in lots of other states, you can continue to maintain a challenge to the issuance of the policy. That's why Transamerica didn't contest this policy. If anybody could say, well, you really committed fraud on us because Nancy didn't know what was going on, that was Transamerica. They had that claim. They didn't make it. My client didn't do anything to procure this policy. My client is a business that is in the business of settling life insurance policies, and it made a purchase. The fraud it claimed was that it was lied to in the transfer. There were misrepresentations about Nancy's health. She was healthier than we were told, and we were told the premiums had all been paid and they weren't. So my client initially wanted to get out of the deal, said, give us our money back, we're walking away, and the trust fought that. Ultimately, we bought the policy out of an auction when the trust defaulted. So this whole notion that my client somehow did something underhanded or wrong is just unsupported. But that's true of almost every argument you hear today. If you listen to what they say and then go back and look at the record, you'll see it isn't so. This oral argument was a prime example of that. Nancy Bergman signed the policy application. Arthur Kramer was not the one who came up with the idea. We've got a document that clearly was altered. So based on that, with all respect to Judge Pearsall, you should reverse and remand on the sanctions issue. You should affirm the summary judgment decision. You should either do it because it's just right on the arguments that they made, or conversely, you can say, well, the only appeal they took was from the order denying the reconsideration, and, you know, that's not an abuse of discretion. So it's your view that if we were to look at it as sort of a reopening of the summary judgment, there's still no genuine issue of material fact on any issue related to Nancy Bergman's coercion or influence? There is absolutely not. Again, it's emblematic of how this litigation went. After they lost summary judgment, they said, well, nefarious influence, Judge. You didn't consider it. We need discovery. Now, remember, this is the estate saying it. This is the estate that has her son, Sim Bergman, as the personal representative. Anybody knows facts relating to how Nancy dealt with all of this, it would be him. But he says we need discovery. What does this discovery show? Oh, medical records show she's a sharp lady, that she knows what she's doing. Discovery shows she wanted to know what was in it for her. She wanted to do something for her grandson. She wanted cash herself, which she got. So, you know, if you look at all of it, there's still nothing there. 580 pages we put in, they don't cite a fact in their brief about the nefarious influence. It's not much more clear than that. So you've got several paths to affirm the merits decision, and I think appropriately should reverse. And on that, just to clarify, you're not contending that the merits is not before this court on appeal? This court says that when you're reviewing a reconsideration, you can go back and look at the merits issue. But if you look at what they did to oppose the summary judgment motion, you've got to affirm. And then if you say, well, all the other stuff they want to throw up against the wall not only wasn't properly done because reconsideration is not an opportunity to raise factual or legal issues you could have raised before but didn't, but it's just wrong to. Thank you very much. Counsel, you have two minutes and 38 seconds. Yes. Obviously we'll make it quick. Briefly, most of the argument I just heard from Mr. Magnuson is responding to an argument that I haven't made. I'm not here to do anything other than to express to this court, as I believe I did in our briefs, what I think the key issue in the case is. I'm not running away from the fact that I disagree with how trial counsel presented the issues. It could have been presented better. It could have been presented clearer. But the bottom line is most of Mr. Magnuson's argument and SPV's arguments all along have been a distraction. So let me point you to appendix page 462. Nancy Bergman did not procure this policy. She signed an application. How did she sign it? As the insured. Who signed it as the owner? Nachman Bergman. The insured always has to sign the application as the insured because it has an authorization to obtain information, such as their medical records. The fact is neither Mr. Magnuson nor the briefs of SPV nor below have ever confronted the fact that unlike Kramer, Nancy Bergman did not procure this policy. Mr. Kramer was the owner of the policy. Nancy Bergman was not. The statute's very clear. In order to procure, it's not just a matter of signing a form. You have to be the owner. That's the whole point because when you're the owner, it's an investment, not a wager. If you're not the owner, it's a wager, not an investment. And that's what's been missed in the lower court. That's what's missed by SPV. They don't want to confront that issue because when you read Kramer and you read those old cases from the early 1900s having to do with assignment, what didn't happen here, there was no assignment. There didn't have to be an assignment because Nancy Bergman never owned the policy and therefore never had to assign it. Number two, we're not claiming nefarious influence. I understand what was claimed below, but I'm not claiming it here. We're not claiming that Nachman Bergman's not a grandson. What we're saying is that if you agree that Kramer doesn't apply and you agree with my position as to the clear words of the statute, you have to send this back to explore the material factual issue, which is whether Nachman Bergman had an insurable interest. That would have to be tried. Not nefarious influence, not whether Nancy Bergman was or was not a willing participant. Of course she was a willing participant. She thought she'd get money. She had a condo to pay off. No question about it. That's not the issue. The fact issue for trial is whether Nachman Bergman had an insurable interest. The legal issue for this court is whether Kramer applies to this case. And most of my colleague, Mr. Magnuson's opposing argument, simply says, of course Kramer's on false force. Of course it is. Of course it is. No, of course it isn't. And the reason it isn't is Mr. Kramer, a sophisticated lawyer, bought this policy. His policy. I never argued that it was Nancy Bergman's idea to get the policy. Of course it wasn't her idea. That's not the point. Counsel, your time is expired. Oh, thank you. Sorry. Didn't look at the clock. Thank you. I appreciate being here, Your Honor. All right. Thank you, Counsel. The case is well argued and is submitted. You may stand aside.